Filed 8/3/26

**CERTIFIED FOR PARTIAL PUBLICATION***

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JEFFREY CLUCK, | D087341 |
| Plaintiff and Respondent, | |
| v. | (San Bernardino Super. Ct. Nos. CIVSB2333305, CIVSB2416146) |
| GEO SECURE SERVICES, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Bernardino County, Jeffrey R. Erickson, Judge. Affirmed.

Akerman, Damien P. DeLaney and Thea Alli, for Defendants and Appellants.

Wilshire Law Firm, John G. Yslas, Jeffrey C. Bils and Edward Kim, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part E. of the Discussion.

Defendants The GEO Group, Inc. and GEO Secure Services, LLC (collectively, GEO) appeal from an order denying their motion to compel arbitration of wage and hour claims asserted by plaintiff Jeffrey Cluck in a putative class action. The trial court refused to enforce the arbitration agreement Cluck signed upon his hiring, finding the agreement unconscionable. We ultimately arrive at the same conclusion, though we rest our determination of unconscionability on slightly different grounds. In light of *Fuentes v. Empire Nissan, Inc.* (2026) 19 Cal.5th 93 (*Fuentes*), decided while this appeal was pending, we find the arbitration agreement must be read together with a confidentiality agreement Cluck also signed during his hiring. In doing so, it is apparent that the agreement to arbitrate was unfairly one-sided—compelling Cluck to submit his claims to arbitration while permitting GEO to seek relief for the claims it is most likely to bring against Cluck in court in Florida. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

GEO Secure Services, LLC—a wholly owned subsidiary of The GEO Group, Inc.—is a private contractor that provides housing and transportation services for criminal offenders in federal custody on behalf of various government agencies. GEO hired Jeffrey Cluck to work at its El Centro detention facility in July 2022. Pursuant to its regular "onboarding process," GEO gave Cluck a two-page Arbitration Agreement to sign. Cluck electronically signed the agreement on July 28, 2022. It generally provided for binding arbitration of all disputes arising out of or related to Cluck's employment with GEO. It included an opt-out provision that requires the employee to send a letter to GEO's legal department via mail or fax within 30 days.

2

On the same date, Cluck also electronically signed The GEO Group Confidentiality Agreement (Confidentiality Agreement). In this agreement, Cluck made a series of promises geared toward maintaining GEO's "competitive advantage" in its line of business. These include agreeing not to use company computers to compete, to assign relevant intellectual property to the company, not to solicit its employees to work for a competitor, and "not to engage in any unauthorized use or disclosure of" Confidential Information—for example, GEO's financial information, contacts, and trade secrets. The agreement provided that any breach "will cause irreparable harm" to GEO and so it "will be entitled to" special remedies. It further specified that "any dispute arising from or related to this Agreement" would be resolved "in a court of law, sitting without a jury," in Florida.

In December 2023, Cluck and Susan Knight filed a putative class action alleging various wage and hour violations. In response, GEO moved to compel arbitration of Cluck's claims and dismiss him from the action.[1] Cluck opposed the motion to compel, contending the Arbitration and Confidentiality Agreements, taken together, are unconscionable and thus unenforceable.

The trial court denied the motion to compel. It declined to read the Arbitration and Confidentiality Agreements together. In its view, the agreements did not govern the same issue, since "[n]othing in the [Confidentiality Agreement] indicates it pertains to resolving disputes arising out of Cluck's employment with" GEO. It nevertheless found the Arbitration Agreement, standing alone, was unconscionable. As to procedural unconscionability, the court noted that the agreement failed to

---

[1]    GEO did not direct its motion at coplaintiff Susan Knight because she apparently opted out of the Arbitration Agreement.

provide for "more than minimal discovery" insofar as the agreement stated that " '[d]iscovery will be conducted in accordance with the [American Arbitration Association (AAA)] Rules,' " but GEO did not furnish a copy of the AAA Rules for employment arbitration. The court also found substantive unconscionability on two points. First, it read the agreement as unfairly requiring Cluck to arbitrate his claims against the "Company"—defined to include 16 different entities—as well as its agents, employees, affiliates, successors, subsidiaries, assigns, and parent companies, but not requiring those related entities to arbitrate their claims against Cluck. Second, the court discerned a "high degree" of substantive unconscionability in the failure of the agreement to "carve out sexual harassment or sexual assault claims which cannot be compelled to arbitration under the" Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (Pub.L. 117-90 (Mar. 3, 2022) 136 Stat. 26; see 9 USC §§ 401–402).

GEO timely appealed. While the appeal was pending, the Supreme Court decided *Fuentes, supra*, 19 Cal.5th 93, which discussed the interplay between an arbitration agreement and a confidentiality agreement in assessing substantive unconscionability. At our request, the parties submitted supplemental briefs addressing *Fuentes*.

## DISCUSSION

GEO agrees with the trial court that the Arbitration and Confidentiality Agreements should *not* be read together, contending the court's finding that the agreements did not concern the same issue is supported by the agreements' text. At the same time, GEO takes issue with the court's unconscionability analysis. Regarding procedural unconscionability, GEO contests the court's evaluation of the discovery provision and additionally emphasizes that the agreement allowed Cluck

4

to opt out. As for substantive unconscionability, GEO maintains the agreement to arbitrate was fully mutual—even if taken together with the Confidentiality Agreement—and properly excluded sexual harassment and assault claims. Finally, GEO insists that any unconscionable provisions should be severed from the agreements, consistent with the severability clauses in each agreement.

Like the trial court, we conclude that the agreement to arbitrate is unconscionable, though for different reasons. In our view, the agreement bears some procedural unfairness as it is a contract of adhesion imposed by an employer upon a newly hired employee, and the opt-out provision is too cumbersome to appreciably lessen its oppressiveness. Furthermore, in the wake of *Fuentes*—which was filed *after* the trial court's ruling—we find the Arbitration and Confidentiality Agreements must be construed together. Upon closely examining these agreements as a whole, we conclude they unfairly mandate arbitration of Cluck's claims against GEO while GEO is permitted to pursue its most likely claims—a breach of its confidentiality, noncompete, and nonsolicitation policies—in court. Because this imbalance rests at the core of the overall agreement, and because we do not condone GEO's practices here, it would not be in the interest of justice to enforce the agreement to arbitrate in whole or in part.[2]

---

[2] For these reasons, it is unnecessary for us to address the discovery provision, any lack of mutuality in the Arbitration Agreement alone, or whether sexual assault and harassment claims were properly excluded.

## A. *General Principles of Unconscionability*

" 'A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party.' " (*Fuentes, supra,* 19 Cal.5th at pp. 102–103.) The procedural component of unconscionability "concerns 'the circumstances of contract negotiation and formation,' particularly 'oppression or surprise due to unequal bargaining power.' " (*Id.* at p. 103.) In this context, oppression refers to a lack of negotiation and meaningful choice; surprise occurs when an agreement is difficult to understand, such as when it is full of dense, small-print legalese. (*Id.* at p. 104.) The substantive aspect of unconscionability "concerns 'the fairness of an agreement's actual terms,' i.e., whether those terms 'are overly harsh or one-sided.' " (*Id.* at p. 103.)

" 'Both procedural and substantive elements must be present to conclude a term is unconscionable, but these required elements need not be present to the same degree.' Courts 'apply a sliding scale analysis under which "the more substantively oppressive [a] term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." ' " (*Fuentes, supra,* 19 Cal.5th at p. 103, citations omitted.) "The party resisting enforcement of an arbitration agreement has the burden to establish unconscionability." (*Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 492 (*Ramirez*).) Where, as here, the unconscionability of an arbitration agreement does not turn on the resolution of factual disputes, our review is de novo. (*Id.* at p. 493.)

**B.**     *Procedural Unconscionability*

"[T]here are degrees of procedural unconscionability.  At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 (*Gentry*).)  "Contracts of adhesion that involve surprise or other sharp practices lie on the other end of the spectrum." (*Ibid.*; see also *Ramirez, supra*, 16 Cal.5th at p. 492 [a contract of adhesion is a " 'standardized contract which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it' "].)  Ordinary contracts of adhesion "contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching.' "  (*Gentry*, at p. 469.)  We " 'must be "particularly attuned" to this danger in the employment setting,' " in which the employee faces acute economic pressure.  (*Ramirez*, at p. 494.)  "Thus, although adhesion alone generally indicates only a low degree of procedural unconscionability, the potential for overreaching in the employment context warrants close scrutiny of the contract's terms." (*Ibid.*)

Here, it is undisputed that the Arbitration Agreement is a generic document that GEO drafted and presents to all new employees during its regular onboarding process.  GEO nevertheless maintains the agreement is not adhesive because it contains an opt-out provision:

> "3.  **Your Right to Opt Out of Arbitration.  Arbitration is not a mandatory condition of your employment at the Company, and therefore you may submit a statement notifying the Company that you wish to opt out and not be subject to this Agreement.**  In order to opt out, you must notify the Company's Legal Department at [address] or [fax number] that you are

7

opting out in a signed and dated statement that includes your name and employee number. In order to be effective, your opt out notice must be provided within 30 days of your receipt of this Agreement. If you opt out as provided in this paragraph, you will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. If you do not opt out within 30 days of your receipt of this Agreement, continuing your employment constitutes mutual acceptance of the terms of this Agreement by you and the Company. You have the right to consult with counsel of your choice concerning this Agreement."

To be sure, an opt-out provision tends to undercut a finding of procedural unconscionability. (*Gentry, supra*, 42 Cal.4th at p. 470.) But at the same time, an opt-out provision does not automatically insulate an arbitration agreement from such a finding. (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 69.) The overarching question remains whether Cluck had a " 'meaningful choice in deciding whether to agree' " to arbitrate (*Fuentes, supra*, 19 Cal.5th at pp. 102–103), so we must examine the circumstances under which he made this decision, including the nature of the opt out procedure (see *Gentry*, at pp. 470–472; *Swain*, at p. 68).

In this case, the procedure to opt out of the Arbitration Agreement was sufficiently cumbersome that it did not meaningfully mitigate the procedural unconscionability. The agreement did not state that Cluck's signature was optional, nor did it include a check box allowing him to simply opt out. Instead, the form provided a single signature line for "AGREED AND RECEIVED," implicitly directing Cluck to opt *in*. Then, if he wished to opt out, he would have to wait to receive an employee identification number, draft an opt out "statement," and mail or fax the statement to Florida, all within the first 30 days of starting a new job. In steering all new workers to

8

agree to arbitrate as the default and then take several convoluted steps to opt out, GEO did not offer a simple, genuine, and realistic choice to the vast majority of its employees. Accordingly, we will closely scrutinize the agreement's terms for unfairness.

## C. *The Confidentiality Agreement*

In *Fuentes*, the plaintiff signed an employment agreement containing "a provision mandating arbitration of 'all disputes which may arise out of the employment context'" and later signed two virtually identical confidentiality agreements prohibiting her from using or disclosing confidential information and trade secrets. (*Fuentes*, *supra*, 19 Cal.5th at p. 100; see *id.* at p. 101.) The plaintiff contended that the arbitration agreement was substantively unconscionable because, when read along with the confidentiality agreements, it was unfairly one-sided to the extent it required her to arbitrate all claims she may have against her employer while permitting the employer to litigate in court the claims it was most likely to bring against her. (*Id.* at pp. 107–108.)

This issue turned on whether the parties intended for claims brought under the confidentiality agreements to be exempt from the arbitration mandate. (*Fuentes*, *supra*, 19 Cal.5th at p. 108.) To discern the parties' intent, the Supreme Court first considered the text of the confidentiality agreements and discovered they were silent about the appropriate forum to resolve such claims. (*Ibid.*) They made no reference to arbitration. (*Id.* at pp. 108–109.) Since, "absent an agreement to arbitrate, the default rule is that parties may litigate breach of contract claims in court," the court was inclined to construe this silence as an indication that the parties intended to allow the employer to bring its claims in court. (*Id.* at p. 109, italics omitted.)

9

Reading the confidentiality agreements together with the arbitration agreement, however, rendered the parties' intent ambiguous. (*Fuentes*, *supra*, 19 Cal.5th at p. 109.) The confidentiality agreements stated that they superseded all prior agreements related to unfair competition, trade secrets, and confidentiality, which included the earlier-signed arbitration agreement to the extent it applied to confidentiality-type claims. (*Ibid*.) At the same time, "the arbitration agreement limit[ed] the parties' authority to supersede it by requiring that any future modification of its terms be 'in writing and signed by the President of the Company.' " (*Id*. at p. 110.) Because the record was unclear as to whether the president signed the confidentiality agreements, the Supreme Court ultimately remanded the case to the trial court for further factfinding and litigation on that point. (*Id*. at pp. 111–112.)

In deciding to read the agreements together, the *Fuentes* court cited *Alberto v. Cambrian Homecare* (2023) 91 Cal.App.5th 482 (*Alberto*). (*Fuentes*, *supra*, 19 Cal.5th at p. 109.) In *Alberto*, the plaintiff signed several agreements on her date of hire, including an arbitration agreement and a confidentiality agreement. (*Alberto*, at p. 486.) Applying Civil Code[3] section 1642—which provides that agreements "relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"—the *Alberto* court readily concluded that the agreements should be construed as a package. (*Alberto*, at p. 490.) As it reasoned, the agreements were signed on the same day, they were components of a single transaction—plaintiff's hiring—and they governed the same issue—how to resolve disputes between the plaintiff and her employer arising from her employment. (*Id*. at pp. 490–491.) The confidentiality

---

3 Further undesignated statutory references are to the Civil Code.

agreement was thus relevant in deciding whether the arbitration agreement was unconscionable. (*Id*. at p. 491.)

Attempting to apply *Alberto* and, implicitly, section 1642, the trial court here acknowledged that the Arbitration and Confidentiality Agreements involved the same parties and were signed on the same date as part of Cluck's hiring process. It found the agreements did not govern the same issue, however, because "[n]othing in the [Confidentiality Agreement] indicates it pertains to resolving disputes arising out of Cluck's employment with" GEO.

We think the trial court read *Alberto* more narrowly than is warranted. Indeed, we fail to see how this case is meaningfully distinguishable from *Alberto*.[4] There, the arbitration agreement stated that " '[a]ny and all claims or controversies arising out of' " the plaintiff's employment " 'shall be resolved through final and binding arbitration.' " (*Alberto*, *supra*, 91 Cal.App.5th at p. 486.) The confidentiality agreement, on the other hand, prohibited her from disclosing " 'trade secrets,' "—defined "broadly to include 'information of a confidential, proprietary or secret nature' "—and required her to consent to any injunction "from any court of competent jurisdiction, enjoining and restraining" her from " 'violating or threatening to violate' " the agreement. (*Id*. at p. 487). The *Alberto* court determined that the agreements "governed,

---

4 While "the existence or nonexistence" of the circumstances set forth in section 1642 "is generally a factual question" reviewed for substantial evidence (*Silva v. Cross Country Healthcare, Inc.* (2025) 111 Cal.App.5th 1311, 1322 (*Silva*), the trial court and the parties have relied on the text of the agreements in determining whether they concern the same issue. Where, as here, the interpretation of a contract "does not turn on the credibility of extrinsic evidence," our review is de novo. (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)

ultimately, the same issue—how to resolve disputes arising between [plaintiff] and [defendant] arising from [plaintiff's] employment." (*Id*. at pp. 490–491.) Reading the agreements separately, the court added, "fails to account for the overall dispute resolution process the parties agreed upon." (*Id*. at p. 491.)

In this case, the Arbitration Agreement similarly "applie[d] to any dispute arising out of or related to [Cluck's] employment with" GEO and required "any legal dispute or controversy covered by" the agreement to "be resolved by final and binding arbitration." In the Confidentiality Agreement, by contrast, Cluck agreed "not to engage in any unauthorized use or disclosure of" Confidential Information, not to use company property to compete with GEO, not to solicit GEO employees to work for a competitor, and to assign any relevant intellectual property developed during his employment to GEO. As GEO acknowledges, the Confidentiality Agreement also includes three provisions addressing dispute resolution, none of which involve arbitration:

> "8. **Special Remedies**. The parties agree that a breach of this Agreement by me will cause irreparable harm to Company in addition to any damages that can be quantified. Accordingly, in the event of such a breach or a threatened breach, the Company will be entitled to remedies of specific performance, injunctive relief (temporary, preliminary, and permanent), and any other legal or equitable relief allowed by law… ."

> "12. **Choice of Law and Venue**. … [T]he law of Florida shall govern the interpretation, application and enforcement of this Agreement… . Any legal proceeding arising from or related to this Agreement shall be litigated in a court of competent jurisdiction (state or federal) located in Florida … ."

"15. **Jury Waiver.** The parties agree to resolve any dispute arising from or related to this Agreement in a court of law, sitting without a jury. …"

Upon comparing these agreements, it is true, as the trial court observed, that the Arbitration Agreement expressly covers any dispute arising out of Cluck's employment with GEO whereas the Confidentiality Agreement more specifically outlines his obligations with respect to private information he may learn by virtue of his employment, intellectual property made during his employment, and competitors of the company. To conclude the agreements therefore do not govern the same issue, however, is to define the issue too narrowly, because an employee's alleged disclosure of confidential information can most assuredly create a dispute that arises out of the employment. (See *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1321 ["The fact that each of the written instruments had slightly different (though overlapping) areas of concern does not mean that they are not interrelated"].) Indeed, Cluck's duties as set forth in the Confidentiality Agreement would not exist but for his employment with GEO. And in the event of a breach or threatened breach of such duties, the agreement prescribes a court trial in Florida. Accordingly, as in *Alberto*, we read both agreements as pertaining to the resolution of disputes arising from Cluck's employment. (See *Alberto*, *supra*, 91 Cal.App.5th at pp. 490–491.)

We find further support for our conclusion in *Silva*, *supra*, 111 Cal.App.5th 1311. In that case, the plaintiff signed an arbitration agreement in which she and her employer agreed " 'that binding arbitration shall be the exclusive means of resolving all claims between them, whether or not arising out of or in any way related to' " her employment. (*Id*. at p. 1317.) She also

13

signed an employment agreement that set forth various terms and conditions of her employment, including terms prohibiting her from using or disclosing confidential information and trade secrets. (*Id*. at p. 1318.) The employment agreement specified that " '[a]ll suits, proceedings and other actions relating to, arising out of or in connection with" that agreement will be litigated in federal or state court in Los Angeles. (*Id*. at p. 1319.) The *Silva* court rejected the employer's argument that these agreements did not relate to the same matter because "the former 'sets forth a dispute resolution mechanism' while the latter 'covers a wide range of subjects' " relating to the plaintiff's employment. (*Id*. at p. 1325.) The court determined the agreements covered " 'the general subject matter' of the mechanism to be used in resolving disputes between" the employer and its employees, where the arbitration agreement prescribes arbitration as the default and the employment agreement, "while broadly defining an employee's duties and responsibilities, goes on to define an exception to arbitration as the default dispute resolution mechanism for an employee's breaches of those duties." (*Ibid*.) Here, too, the Arbitration Agreement sets arbitration as the default forum to resolve claims arising from or related to Cluck's employment, and the Confidentiality Agreement creates an exception for GEO's confidentiality- or competition-type claims.

GEO suggests that we should not construe the agreements together under section 1642 because each contains an integration clause. Indeed, the Arbitration Agreement provides that it "replaces all prior agreements regarding the arbitration of disputes and is the full and complete agreement relating to the formal resolution of disputes covered by this Agreement." And the Confidentiality Agreement states:

14

"Except as otherwise provided herein, the terms contained in this document are the entire agreement between the parties concerning the matters covered in it. The parties are not relying upon any representations, understandings or agreements outside of this Agreement in making the decision to enter into it. This Agreement supersedes prior agreements between me and the Company regarding the subject matter addressed in this Agreement … . And, this Agreement supplements and does not replace or modify confidentiality, invention assignment, and restrictive covenant provisions that may be contained in … other agreements between the parties."

The mere existence of an integration clause, however, does not necessarily preclude us from considering whether two agreements should be construed together under section 1642. (*R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1031.) The integration clauses in this case do not clearly indicate the agreements should be read independently. Neither the Arbitration Agreement nor the Confidentiality Agreement specifically references the other. (Cf. *Subaru of America, Inc. v. Putnam Automotive, Inc.* (2021) 60 Cal.App.5th 829, 840–841 [applying § 1642 not warranted where one agreement expressly states it does not modify a second agreement and " 'is a separate, negotiated contract apart from' " the second (italics omitted)].) And where two agreements are signed at the same time, both covering dispute resolution and both containing an integration clause, it is not clear which is controlling.

GEO also appears to argue that the agreements cannot govern the same issue or comprise a single transaction because the Confidentiality Agreement was a condition of Cluck's employment whereas the Arbitration Agreement was optional, affording Cluck 30 days to decide whether to opt out. But the idea that a theoretical employee could have opted out of the

15

Arbitration Agreement is irrelevant. Here, it is undisputed that Cluck signed both agreements at the same time during his hiring and did not opt out. With both agreements so signed, we may properly ask whether the parties intended them to be construed together. We have answered that question in the affirmative and therefore consider the Confidentiality Agreement in assessing unconscionability.

**D.    *Substantive Unconscionability***

"An arbitration agreement need not 'mandate the arbitration of all claims between' the parties." (*Ramirez*, *supra*, 16 Cal.5th at p. 495.) "However, if an agreement singles out certain claims for arbitration, there must be 'mutuality.' " (*Ibid*.) " 'Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on 'business realities'… ." (*Ibid*.) "In the absence of justification, we assume the agreement is unconscionable." (*Id*. at p. 496.)

GEO contends there is no lack of mutuality here. As it reasons, the Confidentiality Agreement would control—thus allowing it to pursue its claims in court—only if Cluck opted out of the Arbitration Agreement. But since he opted in, GEO maintains, the Arbitration Agreement controls and it would be equally obligated to arbitrate confidentiality disputes.

We are not persuaded. Construing the Arbitration and Confidentiality Agreements together means we endeavor " 'to give effect to every clause and harmonize the various parts' " of both agreements. (*Santana v. Studebaker Health Care Center, LLC* (2026) 120 Cal.App.5th 1, 23.) And were we to

16

agree with GEO's construction, it would render meaningless multiple terms in the Confidentiality Agreement requiring the parties to resolve disputes arising thereunder in court.

In reading the agreements together, we understand them to generally require arbitration of disputes arising from or related to Cluck's employment, with the exception of disputes arising from or related to the specific duties set forth in the Confidentiality Agreement, which are to be resolved in court. Indeed, the Arbitration Agreement very broadly applies to "any dispute arising out of or related to" (a) Cluck's employment with the "Company"— defined to "refer jointly and separately to" 16 distinct companies, including defendant The GEO Group, Inc.[5]; (b) his "relationship with any of its or their agents, employees, affiliates, successors, subsidiaries, assigns or parent companies"[6]; and (c) the termination of employment. The agreement then further broadens its scope in the following paragraph, which provides that it "also applies, without limitation, to disputes with any entity or individual arising out of or related to" several topics, including the employment relationship, trade secrets, unfair competition, compensation, overtime, rest periods, discrimination, and harassment.

---

[5] The other companies are: BI Incorporated, BI Mobile Breath Inc., CCGI LLC, Cornell Abraxas Group OS, LLC, Cornell Abraxas Group, Inc., Cornell Companies of CA OS LLC, Cornell Companies of TX OS LLC, Cornell Interventions OS, LLC, GEO Care, LLC, GEO Corrections & Detention LLC, GEO Corrections Holdings, Inc., GEO Re-Entry Services LLC, GEO Transport, Inc., Protocol Criminal Justice, Inc., and Community Education Centers, Inc.

[6] As noted above, defendant GEO Secure Services, LLC is a wholly owned subsidiary of defendant The GEO Group, Inc.

17

By contrast, the Confidentiality Agreement more narrowly applies to disputes between Cluck and The GEO Group, Inc. and "any entity (parent, subsidiary, or otherwise) that is under common ownership or control with The GEO Group, Inc. or its successors or assigns" that Cluck is "employed with, entrusted with Confidential Information about, or otherwise [has] material involvement with." In this agreement, as discussed, Cluck makes several promises centered around maintaining GEO's competitive edge, including that he would not "engage in any unauthorized use of disclosure of" Confidential Information, compete with GEO, or solicit its employees to work for a competitor.

In other words, we can harmonize the agreements because the scope of the entities, individuals, and claims covered by the Arbitration Agreement is clearly wider than that of the Confidentiality Agreement. (See § 1652 ["Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract"].) The Arbitration Agreement covers the claims Cluck would most likely bring against GEO, including those based on compensation, overtime, and rest periods. The narrower Confidentiality Agreement ostensibly requires both parties to bring claims arising from or related to that agreement in court, but any breach of the obligations set forth therein would generally give rise to claims by GEO against Cluck. (See *Ramirez*, *supra*, 16 Cal.5th at p. 498 ["claims related to intellectual property rights and severance or noncompete agreements, claims for equitable relief related to unfair competition or the disclosure of trade secrets or confidential information … are more likely to be employer-initiated"].) In directing the claims Cluck is most likely to bring to

18

arbitration, while permitting GEO to pursue its most likely claims in court, the overall agreement is unfairly one-sided.  (See *id*. at pp. 497–498.)

GEO has not attempted to offer any purported justification for this differential treatment in its supplemental brief, so we must assume the lack of mutuality is substantively unconscionable.  (*Ramirez, supra,* 16 Cal.5th at p. 500.)  Even if GEO had done so, we would likely find the degree of unfairness exceeds any legitimate business need.  (Cf. *Silva, supra,* 111 Cal.App.5th at p. 1329 ["even if we indulge [employer's] ostensible need to access the judicial forum to seek injunctive relief, that need does not justify contractually requiring the employee to consent to the entry of an injunction, without a bond, once in that forum"].)  The Confidentiality Agreement not only allows GEO to seek relief in court, but it mandates that any litigation take place in Florida—where GEO is incorporated but far from where Cluck lives and works—and without a jury.  It further requires Cluck to concede "that a breach of this Agreement by [him] *will cause* irreparable harm to Company in addition to any damages that can be quantified.  Accordingly, in the event of such a breach or threatened breach, the Company *will be entitled to* remedies of specific performance, injunctive relief (temporary, preliminary, and permanent), and any other legal or equitable relief allowed by law."  (Italics added.)

These provisions solely benefitting GEO exacerbate the substantive unfairness of the agreement to arbitrate.  (See *Magno v. The College Network, Inc.* (2016) 1 Cal.App.5th 277, 288–289 [a forum selection provision may render an arbitration agreement unconscionable where it contravenes the nondrafting party's reasonable expectations]; *Stoker v. Blue Origin, LLC* (2026) 120 Cal.App.5th 91, 111 ["provision of the arbitration agreement purporting to waive the right to a jury in any action tried in court is

19

substantively unconscionable"]; *Silva*, *supra*, 111 Cal.App.5th at p. 1329 [term entitling employer but not employee to temporary, preliminary and permanent injunctive relief is substantively unconscionable]; *Alberto*, *supra*, 91 Cal.App.5th at p. 492 [provision waiving the employer's need to show irreparable harm is unconscionable and exceeds "the legitimate 'margin of safety' for the employer"].)  In other words, Cluck must submit his claims to arbitration, while GEO may pursue its claims before a judicial forum, in a convenient location, with shortcuts to relief.  The imbalance of concessions that Cluck must make compared to GEO is unjustified and unconscionable.

## E.	*Severance*

"If a contractual clause is found unconscionable, the court may, in its discretion, choose to do one of the following:  (1) refuse to enforce the contract; (2) sever any unconscionable clause; or (3) limit the application of any clause to avoid unconscionable results." (*Ramirez*, *supra*, 16 Cal.5th at p. 513; see § 1670.5.)  Assuming a contract has a legal purpose, a court must first ask "whether the contract's unconscionability *can* be cured purely through severance or restriction of its terms, or whether reformation by augmentation is necessary." (*Ramirez*, at p. 516.)  Where "the offending provision can be severed or limited, and 'the rest of the arbitration agreement left intact,' then severance or restriction is the preferred course for provisions that are collateral to the agreement's main purpose." (*Ibid*.)  If the unconscionability can only be cured through augmentation, the court should not enforce the contract because "[c]ourts cannot 'rewrite agreements and impose terms to which neither party has agreed.'" (*Ibid*.)  If a contract contains a severance clause, the court should take it into account, but it does not divest the court of its discretion under section 1670.5.  (See *Ramirez*, at p. 517.)

20

"Even if a contract *can* be cured, the court should also ask whether the unconscionability *should* be cured through severance or restriction because the interests of justice would be furthered by such actions." (*Ramirez, supra*, 16 Cal.5th at p. 516.) In this analysis, the court may consider whether severance would incentivize the "employer to draft a one-sided arbitration agreement in the hope employees would not challenge the unlawful provisions, but if they do, the court would simply modify the agreement to include the bilateral terms the employer should have included in the first place." (*Id.* at p. 517.) A court should not enforce an agreement where it appears the employer "engaged in a systematic effort to impose arbitration on the [employee] not simply as an alternative to litigation, but to secure a forum that works to the [employer's] advantage." (*Id.* at pp. 516–517.)

GEO asks that we remand for the trial court to consider whether any offending terms can be severed, but remand is not necessary in this case. Upon concluding the Arbitration Agreement was unconscionable standing alone, the trial court impliedly found severance was unwarranted. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown' "].) We have now determined that the Arbitration Agreement, taken together with the Confidentiality Agreement, is unconscionable based on its lack of mutuality. There would be no rational basis for the trial court to reverse course and sever the terms it initially found offensive, as well as the terms we have deemed offensive on appeal, if we were to remand.

In any event, severance is not the appropriate course of action here. The central purpose of the agreements taken together is to lay out how disputes between GEO and its employees will be resolved. In a sleight

21

of hand, GEO has each employee sign the Arbitration Agreement—which gives the impression that both the employee and GEO will submit to the alternative forum—and makes it unnecessarily difficult and time-consuming for the employee to opt out.  It then separately requires the employee to sign the Confidentiality Agreement—which allows GEO to bring its most likely claims in its favored forum and "puts a thumb on [GEO's] side of the scale in obtaining any and all injunctive relief in that judicial forum."  (*Silva, supra,* 111 Cal.App.5th at p. 1331.)  This unfairness strikes at the heart of the overall agreement between the parties.  We cannot endorse GEO's attempt to obscure this one-sidedness behind the cumbersome opt-out provision and the separate Confidentiality Agreement.  Accordingly, even assuming the unconscionable provisions could be severed from the agreements, severance would not be in the interest of justice here.

### DISPOSITION

The order denying the motion to compel arbitration is affirmed.  Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


KELETY, J.

22